**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5350-18T2

IN THE MATTER OF
THE ESTATE OF
STUART V.V. WILLSON,
    Deceased.

_____

Submitted June 3, 2020 – Decided June 30, 2020

Before Judges Haas, Mayer and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Mercer County, Docket No. P-16-000365.

Pisciotta & Menasha LLC, and Starr Gern Davison & Rubin PC, attorneys for appellant Wylie R. Willson (Cathyanne A. Pisciotta and Ronald L. Davison, on the briefs).

Flaster Greenberg PC, attorneys for respondent Amelia Willson (John Philip Kirchner and Eric R. Clendening, on the brief).

PER CURIAM

Plaintiff Wylie R. Willson (Wylie) appeals from an August 1, 2019 order granting summary judgment in favor of defendant Amelia Willson (Amelia) and denying her motion for partial summary judgment.[1]  We affirm.

Amelia is the second wife of decedent Stuart V.V. Willson (Stuart).  Wylie is Stuart's daughter with his first wife.  Stuart and Amelia were married for over twenty-five years.

In 1992, two years after Stuart and Amelia married, Stuart executed a will equally dividing his residual probate estate between Amelia and Wylie.  In addition, Wylie was given a $100,000 general bequest.  From 1992 to 2014, Stuart made several new wills that adhered to the equal division of his residuary estate between Wylie and Amelia but eliminated the $100,000 general bequest to Wylie.  In each of the revised wills, Amelia was named co-executor of the estate, along with Stuart's estate attorney.

From 2014 until just prior to his death in March 2016, Stuart changed his estate plan three more times.  On June 3, 2014, Stuart executed a will giving his entire residuary estate to Wylie and designating her as the sole executor.  During

___

[1]  Because the parties share the same last name, we refer to them by their first names.  No disrespect is intended.

his lifetime, Stuart financially supported Wylie, providing her with an estimated $1 million.

In November 2014, Stuart executed a new will. The November 2014 will named Amelia as the sole executor and beneficiary of the residuary estate.

Just prior to executing the November 2014 will, Stuart also changed the beneficiary designations on his two retirement accounts. Amelia was designated the sole beneficiary on one account. The other account was to be distributed as follows: ten percent to Amelia, thirty percent to Wylie, and the remainder to other members of Stuart's family. In April 2015, Stuart again changed the beneficiary designation on his second retirement account, distributing sixty-seven percent to Amelia and thirty-three percent to Wylie. In February 2016, Stuart designated Amelia as the sole beneficiary on the second retirement account.

Starting in 2012, Stuart's health declined. In November 2015, he began using a wheelchair. During a November 27, 2015 examination, Stuart's physician described his condition as "normal," finding he was "[o]riented to time, place, person & situation. Appropriate mood and affect."

In January 2016, Stuart told his estate lawyers that he wanted to limit Wylie's inheritance to $200,000. While discussing with Stuart the intent to

revise his estate plan, Stuart's attorney noted the absence of any mental incompetence or undue influence regarding Stuart's wishes in distributing his estate. During a medical exam on January 20, 2016, Stuart's doctor described Stuart as "alert and oriented" and "in no acute distress."

On January 26, 2016, Stuart and Amelia went to the estate planning lawyer's office to execute a new will.[2] Due to a recent snowfall, Stuart's attorney and Stuart were unable to meet face-to-face. Another partner in the law firm, who previously drafted wills for Amelia,[3] went to the parking lot to discuss Stuart's will and witness its execution. In addition, two law firm employees went to Stuart's car to serve as a witness and notary.

Standing outside of Stuart's car, the attorney reviewed the new will with Stuart. Amelia left the car when Stuart discussed the terms of the new will with his attorney. According to counsel, Stuart acknowledged he understood the provisions in the new will. Based on their discussion, the attorney found Stuart had testamentary capacity to execute the will. Counsel explained she would not

---

[2] Ultimately, this became Stuart's last will.

[3] In a February 12, 1999 letter, Amelia's attorney disclosed the possible conflict of interest and loss of attorney-client privilege due to the firm's joint representation of Amelia and Stuart. Amelia and Stuart countersigned the letter, waiving any potential conflict.

have allowed Stuart to execute the will if there was any doubt as to his understanding of the will or his testamentary capacity. The individual who notarized the will certified Stuart understood what he was signing. In addition, the notary reported that she did not observe anything suspicious regarding the execution of the will.

The January 2016 will bequeathed $200,000 to Wylie and nothing else. Shortly after executing the January 2016 will, Stuart instructed his estate planning attorneys to draft a memorandum explaining why he changed his estate plan.

After preparing the memorandum Stuart requested, on February 9, 2016, one of the attorneys went to Stuart's home to review the document. Amelia was not in the room when Stuart discussed the memorandum with his attorney. The meeting between Stuart and his lawyer lasted forty-five minutes to one hour. The attorney who witnessed the January 2016 will attended the meeting to review the February 2016 memorandum. Counsel had no doubt about Stuart's mental competency at the February 2016 meeting, nor any doubt about Stuart's desire to limit the bequest to Wylie and remove her as a beneficiary on his retirement account.

A-5350-18T2

The memorandum, as ultimately signed by Stuart, explained he removed Wylie as a beneficiary on his retirement account because he "made significant gifts to her annually" throughout his life, and the $200,000 bequest in his will was adequate. The document confirmed that Stuart's changes to his estate plans, including removal of Wylie as a beneficiary on his retirement account, were undertaken at Stuart's express request.

From the date of his execution of the memorandum until his death, Stuart received treatment from a hospice doctor who noted that while Stuart's responses were somewhat delayed, he was "alert oriented x3." The director of the hospice care facility certified that when she spoke to Stuart, he was "extremely alert and oriented and clear." Stuart died on March 2, 2016.

Just days after his death, on March 8, 2016, Wylie filed a caveat to the appointment of Amelia as executor of Stuart's estate. On March 15, 2016, Amelia filed a verified complaint to probate the January 2016 will. Wylie filed an answer and counterclaim alleging Stuart lacked the requisite mental competence to execute the November 2014 and January 2016 wills and to change the beneficiary designations for his retirement accounts.

After completing discovery, Amelia moved for summary judgment as to Wylie's claims. Wylie opposed the motion and cross-moved for partial summary

6

judgment, seeking a presumption of undue influence based on an alleged confidential relationship and suspicious circumstances surrounding the execution of his November 2014 and January 2016 wills and the changes to the beneficiary designation on Stuart's retirement accounts.

The parties submitted voluminous exhibits with their respective motions, including deposition transcripts, medical records, certifications, and statements of material fact. After hearing oral argument on August 1, 2019, the trial judge granted Amelia's motion for summary judgment and denied Wylie's cross-motion for partial summary judgment. The judge concluded Wylie failed to establish a lack of testamentary capacity as to Stuart's November 2014 and January 2016 wills. Instead of presenting clear and convincing evidence in support of her claims, the judge found Wylie submitted her own speculation and a report by a medical expert who never examined Stuart and rendered an opinion based solely on documents provided by Wylie.

The judge determined "[t]he evidence presented . . . in this case clearly and convincingly demonstrate[d] that at the time of the execution of the [w]ills, that Stuart had testamentary capacity." The judge extensively summarized the certifications submitted by various individuals, other than Wylie, who cited examples of Stuart's testamentary capacity when he executed the November

2014 and January 2016 wills and changed the beneficiary of his retirement account. The judge also noted the February 9, 2016 memorandum was "drafted . . . at Stuart's expressed instructions as an explanation by Stuart to [his estate attorneys] of his reasons for changing his estate plan, including the changes reflected in his Last Will and the changes to his beneficiary designation of his IRA." In reading from that memorandum, the judge quoted Stuart:

> I am hereby confirming that [at] my expressed direction the primary beneficiary of my IRA account was changed solely to my wife, Amelia Willson. I have intentionally removed my daughter, Wylie, as a primary beneficiary of my IRA because I have made what I feel is adequate provision for her in my [w]ill and have made significant gifts to her annually during my lifetime, some of which required gift tax returns.

The judge further noted Stuart's medical providers "uniformly described him as mentally sharp and appropriately focused" during the relevant time periods.

Against the overwhelming evidence supporting Stuart's testamentary capacity, the judge found "what we have from Wylie with regards to [Stuart's] capacity is very little, other than the fact that there is a change in the estate documents." Therefore, the judge granted summary judgment in favor of Amelia and dismissed Wylie's claim that Stuart lacked mental capacity.

In reviewing Wylie's undue influence claim, the judge considered the factors required to prove such a claim and determined Wylie failed to submit

8

sufficient evidence of a confidential relationship and suspicious circumstances to support that allegation. The judge explained "[n]one of the evidence presented to the [c]ourt demonstrates that the character of the relationship between Stuart and Amelia was any different than one would expect from any other marriage of some period of time – this was over [twenty] years[.]" The judge found "the actions between Stuart and Amelia, most especially over the last four or five years of the relationship [prior to] Stuart's death, just evidences to the [c]ourt a natural [marital] relationship. The actions taken by Amelia did not demonstrate to the [c]ourt any confidential relationship." He also noted Wylie failed to demonstrate any suspicious circumstances other than to state that her father changed his estate plan. After reviewing the evidence presented, the judge concluded

> the evidence . . . shows both that Stuart was fully competent when he made these decisions, the evidence that there was some trouble in the relationship between him and Wylie. . . . there's . . . not been a sufficient showing of any type of suspicious circumstance[s] that would lead the [c]ourt to shift the burden of proof in this particular case.

Therefore, the judge dismissed Wylie's undue influence claim.

On appeal, Wylie argues the judge erred in granting summary judgment and dismissing her claims of undue influence and lack of testamentary capacity.

We review a trial court's grant of summary judgment de novo, applying the same standard as the trial court. Townsend v. Pierre, 221 N.J. 36, 59 (2015). Summary judgment is appropriate where the record establishes there is "no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). We view the evidence in the light most favorable to the non-moving party to determine whether there exist genuine disputes of material fact. Petro-Lubricant Testing Labs., Inc. v. Adelman, 233 N.J. 236, 256 (2018); see also Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

To defeat a motion for summary judgment, the non-movant must raise more than "some metaphysical doubt as to the material facts." Triffin v. Am. Int'l Grp., Inc., 372 N.J. Super. 517, 523-24 (App. Div. 2004) (quoting Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3rd Cir. 1992)). "[B]are conclusory assertions in an answering affidavit are insufficient to defeat a meritorious application for summary judgment." Brae Asset Fund, L.P. v. Newman, 327 N.J. Super. 129, 134 (App. Div. 1999). See also Pressler & Verniero, Current N.J. Court Rules, cmt. 2.3.1 on R. 4:46-2 (2020) ("self-serving assertion[s] alone will not create a question of material fact sufficient to defeat a summary judgment motion").

A-5350-18T2

In any challenge to a testamentary disposition, it is presumed "the testator was of sound mind and competent when he executed the will" unless a beneficiary unduly influenced the testator to make the disposition. In re Livingston's Will, 5 N.J. 65, 71 (1950). Undue influence is the "mental, moral, or physical exertion of a kind and quality that destroys the free will of the testator by preventing that person from following the dictates of his or her own mind as it relates to the disposition of assets, generally by means of a will or inter vivos transfer." In re Estate of Stockdale, 196 N.J. 275, 302-03 (2008) (citing Haynes v. First Nat'l State Bank, 87 N.J. 163, 176 (1981)).

When analyzing a claim of incapacity to make a testamentary disposition, courts presume the testator had the necessary capacity. In re Will of Liebl, 260 N.J. Super. 519, 524 (App. Div. 1992) (citing Haynes, 87 N.J. at 175-76). "[T]he law requires only a very low degree of mental capacity for one executing a will." Ibid. (quoting In re Will of Rasnick, 77 N.J. Super. 380, 394 (Cty. Ct. 1962)).

Applying these principles, we reject Wylie's contentions of undue influence and lack of testamentary capacity. Based on our de novo review of the record, we affirm the August 1, 2019 order substantially for the reasons set forth by Judge Paul Innes in his oral decision.

Here, despite Judge Innes's repeated requests to provide evidence in support of her contentions, Wylie was unable to cite to any specific evidence other than Stuart's changes to his estate plan. Wylie's reliance on speculation and her own doubt about the certifications attesting to Stuart's testamentary capacity, without more, was insufficient to withstand a meritorious summary judgment motion. Because the evidence was so one-sided, summary judgment in favor of Amelia was proper. Brill, 142 N.J. at 533.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION